IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Deion Javon Richardson, | ) | C/A No.: 1:14-1915-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

 This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Joseph F. Anderson, Jr., filed May 19, 2014, referring this matter for disposition. [ECF No. 7]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 5].

 Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On December 8, 2010, Plaintiff filed an application for SSI in which he alleged his disability began on July 15, 2005. Tr. at 109–13. His application was denied initially and upon reconsideration. Tr. at 61–65, 69–71. On November 15, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Arthur L. Conover. Tr. at 27–58 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 14, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 13, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 31 years old at the time of the hearing. Tr. at 30. He completed the eighth grade. Tr. at 174–75. He had no past relevant work ("PRW"). Tr. at 53. He alleges he has been unable to work since July 15, 2005. Tr. at 109.

2.    Medical History

On July 10, 2005, Plaintiff presented to the emergency department at Carolina Pines Regional Medical Center ("Carolina Pines") following a rollover motor vehicle accident. Tr. at 401. Plaintiff was noted to be "ambulatory at scene." *Id.* Plaintiff complained of neck pain, left shoulder pain, headache, chest pain, joint pain, and

extremity pain. Tr. at 403. X-rays of Plaintiff's cervical spine and left shoulder were normal. Tr. at 406, 407. The provider's clinical impressions were cervical strain and left shoulder contusion. Tr. at 404.

On January 11, 2006, Plaintiff reported to Pickens K. Moyd, M.D. ("Dr. Moyd"), that he continued to experience pain in his right shoulder and lower back from the rollover accident in July. Tr. at 186. Dr. Moyd noted Plaintiff sustained sprains to his cervical spine, right elbow, right shoulder, and lumbar spine. *Id.* He also indicated Plaintiff had a 40 percent motion deficit in his right shoulder. *Id.* He referred Plaintiff to physical therapy. Tr. at 187–89. On February 21, 2006, Plaintiff reported decreased pain in his lower back, but complained of persistent soreness and stiffness. Tr. at 189. The physical therapist noted that Plaintiff had persistent pain and that the future of the injury was "uncertain" because of possible post-traumatic arthritis. *Id.* Dr. Moyd wrote a letter on February 23, 2006, that explained Plaintiff's diagnoses and course of treatment. Tr. at 190. Dr. Moyd indicated Plaintiff had received the maximum benefit from physical therapy. *Id.* He stated Plaintiff's prognosis was guarded and he "stands a better chance of developing post traumatic arthritis." *Id.*

On December 28, 2006, Plaintiff presented to Carolina Pines after sustaining a dog bite to his left calf while at a club. Tr. at 397. Plaintiff was described as "ambulatory" and he had "full range of motion." *Id.* He indicated he smoked four packs of cigarettes daily and drank a "12 pk/day" and "1 pint of Gin." *Id.* The provider administered a tetanus shot and prescribed Augmentin. Tr. at 398.

Plaintiff presented to Carolina Pines on April 20, 2007, complaining of chest pain. Tr. at 391. A chest x-ray was normal. Tr. at 394. The provider's clinical impressions included "chest pain, acute alcohol intoxication, and [illegible]." Tr. at 392. Plaintiff presented to Carolina Pines with the same symptoms five days later. Tr. at 383. He was again using alcohol, and a chest x-ray was again negative. Tr. at 387, 388.

On May 6, 2007, Plaintiff presented to Carolina Pines with chest pain and an injury to his right hand. Tr. at 377. Plaintiff indicated he was upset by his ex-girlfriend and had been drinking when he hit a telephone pole with his hand. *Id.* Plaintiff's chest wall was "tender to touch." Tr. at 378. He was diagnosed with chest wall pain, alcohol intoxication, and a boxer's fracture to the fifth metacarpal of his right hand. Tr. at 378.

Plaintiff presented to Carolina Pines on December 25, 2007, for an injury to his ribs sustained while wrestling. Tr. at 366. He was prescribed Motrin and Lorcet and discharged home. Tr. at 367. Plaintiff returned to Carolina Pines a week later, complaining of rib pain. Tr. at 362. An x-ray indicated Plaintiff did not have a rib fracture or other abnormalities in his ribs. Tr. at 363. Plaintiff stated that he was almost out of pain medication, and the provider prescribed more medication. Tr. at 362.

Plaintiff presented to Carolina Pines on February 14, 2008, complaining of swelling on the right side of his neck. Tr. at 354. He was prescribed Lorcet for pain and discharged. Tr. at 357. He returned to Carolina Pines two weeks later, where he was admitted for facial cellulitis. Tr. at 342. He was diagnosed with a submandibular abscess, which was opened and drained. Tr. at 343. He responded well to parenteral antibiotics and was released on March 2, 2008. Tr. at 342, 343.

4

On January 23, 2009, Plaintiff presented to Carolina Pines for a nosebleed. Tr. at 331. The triage assessment notes Plaintiff indicated he drank beer and "24 pack day." *Id.* The provider's clinical impressions included epistasis (resolved) and alcohol abuse. Tr. at 332. Plaintiff was advised to discontinue use of alcohol. *Id.*

Plaintiff presented to Carolina Pines on August 7, 2009, complaining of pain and swelling in the right side of his jaw. Tr. at 327. He was prescribed medication and returned for a recheck next day. Tr. at 321, 326. He returned to Carolina Pines five days later to report difficulty swallowing and no improvement with antibiotics. Tr. at 314. A CT scan revealed a large right submandibular abscess. Tr. at 316. An incision and drainage procedure was performed the next day. Tr. at 305. He followed up for a wound check on October 1, 2009, and smelled "strongly of ETOH," but his wound was healing well. Tr. at 299–301.

On December 18, 2009, Plaintiff presented to James Siegmann, M.D. ("Dr. Siegmann"), for elevated blood pressure. Tr. at 219. Plaintiff indicated he was feeling well, and Dr. Siegmann noted no abnormalities on examination. Tr. at 219–20. Dr. Siegmann refilled Plaintiff's prescriptions for blood pressure medications. Tr. at 220.

On January 31, 2010, Plaintiff presented to the emergency department at Carolina Pines following episodes of syncope and hyperventilation. Tr. at 289. Plaintiff was intoxicated. Tr. at 288. He stated he had not taken his blood pressure medication in two days. Tr. at 288. He was prescribed Lisinopril, directed to decrease his alcohol intake, and discharged. Tr. at 288, 289.

Plaintiff presented to Katherine J. Kelly, Ph.D. ("Dr. Kelly"), for a consultative mental status examination on February 18, 2011. Tr. at 191–93. Plaintiff reported he lived with his parents. Tr. at 191. He stated that he visited stores with his girlfriend and played dominoes and video games with friends. *Id.* He indicated he washed dishes and clothing, cleaned his bedroom and bathroom, prepared meals, swept, and took out the trash. *Id.* He reported he bathed, dressed, and performed other self-care tasks on his own. *Id.* He stated he had never had a driver's license. *Id.* Plaintiff indicated he completed the tenth grade and was not enrolled in special education classes. Tr. at 192. Plaintiff denied mood problems, but endorsed memory problems. *Id.* He recounted the rollover accident in 2005 and stated "everything that is wrong with me started after that accident." *Id.* Plaintiff indicated he had not used alcohol in "probably a month" and denied abusing alcohol. *Id.* He endorsed a history of arrests, but stated that he had not been incarcerated for more than 30 days at a time. *Id.* Dr. Kelly administered the Mini-Mental State Examination ("MMSE"). *Id.* Plaintiff provided his name, date of birth, age, city, state, and county. *Id.* He recalled three objects immediately and after five minutes. *Id.* He wrote a novel sentence, followed directions, read a simple sentence, and copied a design. *Id.* He failed to accurately provide the date and made one error on the serial-sevens test, which he performed slowly. *Id.* He repeated a phrase slowly and with error. *Id.* Dr. Kelly noted Plaintiff's mood, affect, expressive speech, receptive language, and thought processes were within normal limits. *Id.* She observed Plaintiff's gait to be within normal limits and at a good pace. *Id.* She indicated Plaintiff was able to retrieve his wallet from a back pocket without physical strain. *Id.* She noted Plaintiff sat for an hour without asking to

6

move. Tr. at 193. Dr. Kelly provided the following impression: "[r]ule out Amnesic Disorder NOS versus Dementia Disorder versus Malingering." *Id.* She further indicated there were "indicators of low-average to average intellectual functioning." *Id.*

On February 23, 2011, state agency consultant Philip Michels, Ph.D. ("Dr. Michels"), completed a psychiatric review technique. Tr. at 195–208. He considered Listing 12.02 and suggested a need to rule out amnesic disorder and dementia disorder, NOS. Tr. at 196. He considered Listing 12.08 and suggested a need to rule out malingering. Tr. at 202. Although Plaintiff's impairments met some of the criteria under Listings 12.02 and 12.08, Dr. Michels concluded that his impairment did not meet either Listing because he had only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. at 205.

Plaintiff presented to Harriet R. Steinert, M.D. ("Dr. Steinert"), for an orthopedic consultative evaluation on March 8, 2011. Tr. at 209–10. He alleged pain in his back, right arm, right elbow, and cervical spine and problems with memory and understanding. Tr. at 209. Plaintiff stated he experienced occasional neck pain that radiated to his right shoulder. *Id.* He indicated he could sit for 10 minutes and walk for 30 to 45 minutes. *Id.* He stated he smoked a pack of cigarettes daily and drank 12 beers per week. *Id.* Plaintiff had full range of motion of his cervical spine and all four extremities. Tr. at 209, 211. Dr. Steinert observed moderate tenderness to palpation of Plaintiff's right trapezius muscle, but no tenderness, swelling, deformity, or deficit in any other joint or muscle. Tr. at 209–10. Plaintiff had no sensory or motor deficits and no muscle atrophy. Tr. at 210. His grip

strength was normal bilaterally, and he had normal fine and gross motor skills. *Id.* Plaintiff flexed at the waist to 90 degrees and was not tender to palpation of the spine. *Id.* His straight-leg raise test was negative bilaterally. *Id.* His gait was normal, and he performed the tandem walk and heel-toe walk exercises without difficulty. *Id.* Plaintiff counted from one to 10 and from 10 to one without error and to nine by threes. *Id.* An x-ray of Plaintiff's lumbar spine indicated no fracture or other significant bony or soft tissue abnormality. Tr. at 215. Dr. Steinert assessed right trapezius muscle spasm, hypertension, and probable decreased mental capacity. *Id.*

On March 23, 2011, Plaintiff presented to Dr. Siegmann, complaining of lower back pain. Tr. at 217–18. He described his symptoms as intermittent, moderate, and exacerbated by prolonged standing. Tr. at 217. Dr. Siegmann noted no abnormalities. Tr. at 218. He assessed lumbago and muscle spasm and recommended Plaintiff undergo a screening for depression. *Id.* He prescribed Tramadol HCl 50 mg, Flexeril 10 mg, and Ibuprofen 800 mg and instructed Plaintiff to follow up as needed. *Id.*

Plaintiff presented to the emergency department at Carolina Pines with epigastric pain on June 3, 2011. Tr. at 279. He admitted to heavy alcohol use. *Id.* He was diagnosed with acute gastritis. Tr. at 280.

Plaintiff presented to Patrycia Streater, APRN ("Ms. Streater"), for back pain and headaches on August 18, 2011. Tr. at 232. Ms. Streater referred Plaintiff for an x-ray of his lumbar spine that revealed no abnormalities. Tr. at 236.

On October 20, 2011, Dan H. Allen, Ph.D. ("Dr. Allen"), performed an intellectual assessment of Plaintiff at his attorney's request. Tr. at 240–43. Plaintiff informed Dr.

Allen that he had always lived with his parents. Tr. at 240. He indicated he was in the "slow classes" in school. *Id.* Plaintiff denied alcohol abuse and stated he had "'never, ever' had any trouble with the law." Tr. at 241. Dr. Allen described Plaintiff as lethargic and distracted and stated that "[v]irtually each inquiry was met with a long silence and/or a puzzled look." *Id.* Plaintiff was unable to accurately provide the date. *Id.* He could not identify the President, the capital of South Carolina, or three states. *Id.* He could not provide his address. *Id.* He slowly recited the days of the week and omitted two months when recalling the months of the year. *Id.* Plaintiff was able to recall his phone number and date of birth. *Id.* Dr. Allen assessed a full-scale IQ score of 55, but noted that Plaintiff was penalized by the time limit and that his "optimal level would be in the mid sixties." Tr. at 241. Dr. Allen indicated Plaintiff's short-term auditory memory was impaired. *Id.* Plaintiff demonstrated scores in the first percentile for verbal comprehension, perceptual reasoning, working memory, and processing speed. Tr. at 242. Plaintiff's spelling, reading, and math scores were at the second grade level. *Id.* Plaintiff was unable to multiply or divide numbers. *Id.* He could not tell time using an analog clock. *Id.* However, he knew the values of nickels, dimes, and pennies. *Id.* Dr. Allen indicated Plaintiff was "not engaged with his surroundings" and that he may have "a rather profound depression." *Id.* Dr. Allen concluded as follows:

> The assessed cognitive capacity is in the mildly deficient range, and there is little evidence that this would be enhanced by further training. His slow, deliberate style is to an extent that he could possibly place himself and/or others at risk in a work setting. Although it was certainly beyond the scope of this evaluation to state this conclusively, I saw him as an individual who well may be experiencing difficulties of an organic nature.

Tr. at 243.

Plaintiff presented to Carolina Pines after he sustained a fall on December 23, 2011. Tr. at 256. Hospital record indicated he was intoxicated and his blood alcohol content was 299.6 mg/dL. Tr. at 259, 272. A CT scan of Plaintiff's head revealed no intracranial abnormality and a CT of his cervical spine was normal. Tr. at 257, 258.

Plaintiff presented to the emergency department at Carolina Pines on February 14, 2012, for a hand injury. Tr. at 244. He stated that he "hit a 2 x 4" with his right fist. Tr. at 252. Plaintiff smelled of alcohol. *Id.* An x-ray of his right hand showed no fracture, dislocation, or other significant bony abnormality. Tr. at 245.

On September 15, 2012, Plaintiff presented to Carolina Pines with an open wound on his forehead after he wrecked his bicycle. Tr. at 443. A CT of Plaintiff's brain indicated a very small right frontal subdural hematoma with minimal mass effect on the right frontal lobe and a right frontal scalp laceration and soft tissue swelling with a small right periorbital hematoma. Tr. at 464. A CT of Plaintiff's cervical spine was normal. Tr. at 465. CT scans of Plaintiff's chest, abdomen, and pelvis were unremarkable. Tr. at 466–67. He was diagnosed with a head injury and brief post-concussive syndrome. Tr. at 444. Plaintiff presented the next day for a recheck and complained of vomiting. Tr. at 430. A CT of his brain indicated no acute intracranial hemorrhage. Tr. at 441.

3.     School Records

School records from McBee Elementary School indicated Plaintiff was retained in the third grade, but generally had passing grades. Tr. at 172. Records from McBee High School indicated Plaintiff repeated the eighth grade and had a significant number of absences (15 absences in 1995–1996 and 23 absences in 1996–1997). Tr. at 174. They

also noted Plaintiff was expelled on November 12, 1997. Tr. at 175. Standardized test scores indicated Plaintiff performed below his grade-level, failed to meet multiple objectives, and had scores ranging from the first to the forty-first national percentile. Tr. at 176–78. The records did not specify Plaintiff's IQ, suggest Plaintiff was enrolled in a special education program, or contain an individualized education plan ("IEP"). Tr. at 172–78.

### 4.    Lay Witness Statement

On July 16, 2012, Plaintiff's mother, Carolena Hammonds, indicated in a statement that Plaintiff had a learning disability, repeated the third grade, participated in special education classes, and dropped out of school in the ninth grade. Tr. at 171.

### C.    The Administrative Proceedings

### 1.    The Administrative Hearing

### a.    Plaintiff's Testimony

At the hearing on November 15, 2012, Plaintiff testified he lived in a mobile home with his father. Tr. at 35. He indicated he had a girlfriend whom he saw frequently. *Id.*

Plaintiff stated he completed the ninth grade and was not enrolled in special education classes. Tr. at 32–33. He testified that he had never obtained a driver's license or driven a car. Tr. at 39–40. He stated he attempted the written learner's permit test three or four times, but never passed. *Id.* Plaintiff testified he could read small words, but was unable to read a newspaper. Tr. at 47. He stated he was unable to purchase food using food stamps without assistance. *Id.* He indicated he had never had a bank account or written a check. *Id.*

Plaintiff testified that he experienced pain in his low back and right arm during "bad weather" and when sleeping. Tr. at 48. He indicated he was unable to lift heavy grocery bags with his right hand. *Id.* He stated he could sit for "a little over 30 minutes." Tr. at 49. He testified he could walk for about 30 minutes at a time. Tr. at 49. He stated he was unable to lift his right arm higher than shoulder-level and had difficulty combing his hair. Tr. at 50.

Plaintiff indicated he worked as a cutter for Protective Apparel in 2000. Tr. at 37. He was unable to recall his reason for leaving that job. *Id.* He stated that he worked at a chicken plant, but left because of transportation problems. Tr. at 38.

Plaintiff testified that he was not taking any prescription medication. Tr. at 45. He stated he no longer took blood pressure medication because he could not afford to see a doctor. *Id.* He indicated he experienced dizziness and lightheadedness that led to a bicycle accident requiring hospitalization. *Id.*

Plaintiff denied drinking alcohol or using illegal drugs. Tr. at 39. He indicated he drank prior to his accident in 2005, but had stopped drinking. *Id.*

Plaintiff testified that he enjoyed watching 30-minute television shows, but was unable to sit through a movie without either getting up or falling asleep. Tr. at 52.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Thomas C. Neil, Ph.D., reviewed the record and testified at the hearing. Tr. at 53–57. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was illiterate and was reduced to routine, simple work with oral instructions at the job site; with no involvement in cash transactions; with no

requirement to wait on the public as customers; and with no team-type interaction. Tr. at

53–54. The ALJ asked if there was any work existing in the regional or national economy

that person could perform. Tr. at 54. The VE identified jobs as a machine cleaner,

*Dictionary of Occupational Titles* ("*DOT*") number 699.687-014, with 750 jobs in South

Carolina and 65,000 jobs in the national economy and a cleaner II, *DOT* number

919.687-014, with 900 jobs in South Carolina and 110,000 jobs in the national economy.

*Id.*

Plaintiff's attorney asked the VE to assume the hypothetical individual had poor

short-term memory and worked so slowly and deliberately that he could place himself at

risk. Tr. at 55. She asked if those conditions would affect the jobs previously identified.

*Id.* The VE indicated that individual may have difficulty performing the jobs identified or

any jobs. Tr. at 57.

> 2.     The ALJ's Findings

In his decision dated December 14, 2012, the ALJ made the following findings of

fact and conclusions of law:

1.     The claimant has not engaged in substantial gainful activity since December 2, 2010, the application date (20 CFR 416.971 *et seq.*).
2.     The claimant has the following severe impairment: organic mental disorder (20 CFR 416.920(c)).
3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, 416.926).
4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no more than high marginal education, but is illiterate; and is limited to routine, simple work, with oral instructions at the job site, no cash transactions, no work with the public as customers, no team-type

interaction with co-workers, and the need to work alone or with a small group of co-workers.

5.  The claimant has no past relevant work experience (20 CFR 416.965).

6.  The claimant was born on November 17, 1980 and was 30 years old, which is defined as a "younger-aged" individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a high marginal education, is illiterate and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 2, 2010, the date the application was filed (20 CFR 416.920(g)).

Tr. at 13–22.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ did not properly assess Plantiff's severe impairments;

2)  the ALJ failed to consider Listings 12.05(B) and (C);

3)  the ALJ did not consider the effect of Plaintiff's combined impairments on his RFC;

4)  the ALJ failed to make a credibility finding in accordance with SSR 96-7p; and

5)  the ALJ posed improper hypotheticals to the VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*,

---

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483

F.2d 773, 775 (4th Cir. 1972).

    B.      Analysis

          1.      Severe Impairments

Plaintiff argues the ALJ erred in determining that his only severe impairment was

an organic mental impairment. [ECF No. 14 at 9]. Plaintiff contends he had other severe

impairments, including intellectual disability[3] with a full scale IQ of 55, traumatic

arthritis, and possible amnesic disorder or dementia. *Id.* Plaintiff maintains the ALJ failed

to follow the provisions of SSR 96-3p. *Id.* at 13.

The Commissioner argues that substantial evidence supports the ALJ's step two

analysis. [ECF No. 16 at 8]. She further maintains that any error in failing to assess

Plaintiff's impairments at step two was harmless because the case was not decided at step

two. *Id.* at 8–9. She contends that the ALJ found a severe mental impairment at step two,

proceeded through the remainder of the evaluation process, and considered all of

Plaintiff's credibly-established impairments. *Id.* at 10–11.

A severe impairment is one that "significantly limits [a claimant's] physical or

mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* SSR 96-3p.

A non-severe impairment "must be a slight abnormality (or a combination of slight

---

[3] Plaintiff alleges he is "mentally retarded," but the undersigned notes that the Social
Security Administration replaced the term "mental retardation" with "intellectual
disability" in the listings through a final rule effective on September 3, 2013. Change in
Terminology: "Mental Retardation" to "Intellectual Disability," 78 FR 46499 (Aug. 1,
2013) (codified at 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05). Because the ALJ's
decision was rendered prior to the change in terminology, the decision contains the term
"mental retardation," but the undersigned will hereinafter refer to the impairment as
"intellectual disability," consistent with the rule change.

abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p *citing* SSR 85-28; *see also* 20 C.F.R. 416.921(a).

Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b).

The presence of symptoms alone, such as pain, fatigue, shortness of breath, weakness, or nervousness, does not establish the existence of a severe impairment. SSR 96-3p. For an impairment to be severe, the impairment must be established by objective medical evidence (i.e., signs and laboratory findings) and must reasonably be expected to produce the alleged symptoms. *Id.*; *see also* 20 C.F.R. § 416.908.

The ALJ's recognition of a single severe impairment at step two of the sequential evaluation process ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

In light of the foregoing, the undersigned considers the ALJ's failure to assess intellectual disability, traumatic arthritis, and amnesic disorder or dementia as severe impairments.

### a.     Intellectual Disability

The undersigned finds that the ALJ did not err in failing to address intellectual disability at step two. The ALJ discussed intellectual disability in great detail in subsequent steps. At step three, he examined Listing 12.05 for intellectual disability. *See* Tr. at 14–15. He again discussed intellectual disability in assessing Plaintiff's RFC. *See* Tr. at 20. In light of the ALJ's consideration of intellectual disability at subsequent steps in the sequential evaluation process and for the additional reasons set forth below, the undersigned finds that the ALJ did not err in failing to assess intellectual disability as a severe impairment at step two.

### b.     Traumatic Arthritis

The undersigned finds that the objective evidence does not support a diagnosis of traumatic arthritis and that the ALJ did not err in failing to assess it as a severe impairment. When Plaintiff presented to Carolina Pines following the rollover accident in July 2005, x-rays of his cervical spine and left shoulder were normal. Tr. at 406, 407. In January 2006, Dr. Moyd observed a 40 percent motion deficit to Plaintiff's right shoulder and in February 2006, Dr. Moyd indicated Plaintiff's prognosis was guarded and he had a "chance of developing post traumatic arthritis." Tr. at 186, 190. Plaintiff did not complain of or receive treatment for joint pain between February 2006 and December 2, 2010, the date that he filed for SSI. In March 2011, Plaintiff complained to Dr. Steinert of pain in

his back, right arm, right elbow, right shoulder, and cervical spine, but she found no objective evidence to indicate the presence of traumatic arthritis. Tr. at 209–10. Plaintiff's range of motion was unrestricted and he had no tenderness, swelling, deformities, or deficits in his joints or his spine. Tr. at 209–10, 211. He had no sensory or motor deficits and no muscle atrophy. Tr. at 210. His grip strength and gait were normal and his straight-leg raise was negative. *Id.* An x-ray of his lumbar spine indicated no fracture or other significant bony or soft tissue abnormality. Tr. at 215. Plaintiff presented to Dr. Siegmann later that month complaining of lower back pain, but Dr. Siegmann noted no abnormalities. Tr. at 218. Plaintiff again complained of back pain five months later, but the x-ray of his lumbar spine again revealed no abnormalities. Tr. at 236. A CT scan of Plaintiff's cervical spine, following his fall on December 23, 2011, was normal. Tr. at 258. An x-ray of his right hand on February 14, 2012, was also normal. Tr. at 245. In the absence of objective medical evidence to support a diagnosis of traumatic arthritis, the undersigned is unable to find that traumatic arthritis was among Plaintiff's severe impairments. *See* SSR 96-3p; *see also* 20 C.F.R. § 416.908.

The undersigned further notes that the record contains no evidence, other than Plaintiff's allegations, to suggest that traumatic arthritis or any physical impairment limited his ability to perform basic work activities. Dr. Kelly observed Plaintiff to have normal gait and good pace; to be able to retrieve his wallet from his back pocket without strain, and to sit for an hour without asking to move. *See* Tr. at 192–93. Dr. Steinert observed Plaintiff to have normal range of motion, grip, fine and gross motor skills, and gait. Tr. at 209–10. She also noted Plaintiff was able to flex at the waist. Tr. at 210. In

light of this evidence, the undersigned finds that the ALJ properly concluded that Plaintiff did not "experience a severe physical impairment imposing significant work-related limitations." *See* Tr. at 21.

c.      Amnesic Disorder and Dementia

The undersigned concludes that the record does not support the existence of amnesic disorder or dementia disorder as severe impairments. Plaintiff bases his argument on Dr. Kelly's diagnostic impressions that included "[r]ule out Amnesic Disorder NOS versus Dementia Disorder versus Malingering." *Id.* The Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-V*") dispenses with separate classification of dementia disorders and amnesic disorders and instead classifies both as neurocognitive disorders ("NCDs"). American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013 at 591. *DSM-V* provides that "[n]europsychological testing, with performance compared with norms appropriate to the patient's age, educational attainment, and cultural background, is part of the standard evaluation of NCDs." *Id.* at 607. Of particular importance in this case, "objective performance must be interpreted in light of the individual's prior performance" and "[n]orms are more challenging to interpret in individuals with very high or very low levels of education." *Id.* at 608. Although Dr. Kelly examined Plaintiff and administered the MMSE, she did not administer the battery of neurocognitive tests needed to diagnose NCDs. *See* Tr. at 191–93. Furthermore, she based her impressions on the information provided by Plaintiff without reviewing objective evidence of his prior performance and

without accurate information about his educational background. *See* Tr. at 191. Plaintiff informed Dr. Kelly that he completed the tenth grade, dropped out of school during the eleventh grade, and was an average student. *See* Tr. at 192. However, his school records indicate he obtained below average grades and was expelled from school during the fall of his ninth grade year. *See* Tr. at 174, 175. Given *DSM-V*'s emphasis on the need to review the individual's prior performance and its admonishment that norms are difficult to interpret in individuals with low levels of education, the undersigned is inclined to believe Dr. Kelly's diagnostic impressions were clouded by inaccurate information regarding Plaintiff's educational history. In addition, Dr. Kelly did not indicate Plaintiff had dementia or an amnesic disorder, but merely indicated a need to rule out those impairments based on Plaintiff's behavior and responses during the mental status examination. *See* Tr. at 191–93.

The undersigned further finds that subsequent and more comprehensive testing failed to yield impressions of amnesic disorder or dementia. Dr. Allen's assessment of Plaintiff included a clinical interview, an adult mental status checklist, a psychosocial history form, the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), and the Wide Range Achievement Test-IV ("WRAT-IV"). *See* Tr. at 240–43. Dr. Allen did not indicate he reviewed Plaintiff's school records, but Plaintiff described his educational history to Dr. Allen in a way that was more consistent with the record than the description he provided to Dr. Kelly. *Compare* Tr. at 172–78 (school records), *with* Tr. at 192 (Plaintiff stated he completed tenth grade and was an average (B/C) student), *and* Tr. at 240 (Plaintiff stated he "went to the tenth grade" and that "learning was real hard"). Dr. Allen

assessed Plaintiff to have "mildly deficient" cognitive capacity and "difficulties of an organic nature." Tr. at 243. However, he did not assess amnesic disorder or dementia. The undersigned finds the ALJ did not err in failing to assess amnesic disorder and dementia as severe impairments.

### 2.    Parts (B) and (C) of Listing 12.05

Plaintiff argues that the ALJ erred in failing to determine that his impairments met either Part (B) or Part (C) of Listing 12.05. [ECF No. 14 at 9]. Plaintiff maintains he has a full-scale IQ of 55, which directs a finding that he is disabled under Listing 12.05(B). *Id.* at 10. Plaintiff further argues that even if the ALJ properly rejected the IQ score of 55, he still should have considered Listing 12.05(C) because Dr. Allen indicated Plaintiff's IQ would be in the mid-sixties at a maximum. *Id.* at 11. Plaintiff argues that the record shows the presence of other physical and mental impairments that impose additional and significant work-related limitations of function. *Id.* at 13. Plaintiff contends that the record supports the presence of intellectual disability during his developmental years. *Id.* at 11–12.

The Commissioner contends that Plaintiff's argument is supported only by a one-time examination arranged by his attorney that yielded results in conflict with other credible evidence in the record. [ECF No. 16 at 11]. She maintains that Plaintiff did not satisfy any section of Listing 12.05 because he did not have significant deficits in adaptive functioning prior to age 22. *Id.* at 12–16. She argues Plaintiff did not have a valid IQ score of 59 or less and further maintains that the record does not contain a valid IQ score. *Id.* at 16. The Commissioner contends that the evidence does not indicate

Plaintiff had another severe impairment for the purpose of satisfying part C of Listing 12.05. *Id.* at 18.

The Listings distinguish between organic mental disorders and intellectual disability. *See* 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, §§ 12.02, 12.05. Organic mental disorders are addressed in Listing 12.02, which defines them as "psychological or behavioral abnormalities associated with a dysfunction of the brain." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.02. The Listing further indicates "[h]istory and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and *loss of previously acquired functional abilities*." *Id.* "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested *during the developmental period*, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05. The definitions in the Listings distinguish intellectual disability as deriving from the original state of the brain and organic mental disorders as being caused by changes to the brain. The definitions also provide that intellectual disability pertains to general intellectual functioning, whereas organic mental disorders correlate with specific abnormalities.

To satisfy Listing 12.05(B), the claimant must have an intellectual disability and "a valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05B. To satisfy Listing 12.05(C), the claimant must have both "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental

impairment imposing an additional and significant work-related limitation of function."
20 C.F.R., Pt. 404, Subpt. P, Appx. 1, § 12.05C.

The ALJ found that Plaintiff had an organic mental disorder, but concluded that he
did not have an impairment or combination of impairments that met or medically-equaled
the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix
1. Tr. at 13, 15.

The ALJ specified that he considered Plaintiff's impairment under the
requirements of Listing 12.05. *Id.* The ALJ found Plaintiff's impairment did not meet
Listing 12.05(B) because he did not have a valid verbal, performance, or full-scale IQ of
59 or less. Tr. at 14. He stated that "[w]hile the claimant has an I.Q. score in the
subaverage range, it was noted that he responded slowly and was penalized by the time
limit." Tr. at 20.

Although the ALJ accepted Dr. Allen's assessment of Plaintiff's IQ as being in the
mid-sixties, he did not find Plaintiff was disabled under Listing 12.05(C) because he
found that Plaintiff did not have subaverage intellectual functioning during the
developmental period and because he did not have another impairment that imposed an
additional and significant work-related limitation of function. Tr. at 14, 20–21.

The undersigned finds that the ALJ adequately considered Plaintiff's IQ scores
and determined he had an organic mental disorder, but not an intellectual disability. Dr.
Kelly noted that Plaintiff was a poor historian; had "possible problems understanding and
memory issues"; and had low-average to average intellectual functioning. Tr. at 193. Dr.
Steinert diagnosed "probable decreased mental capacity." Tr. at 210. The examinations

performed by Drs. Kelly, Steinert, and Allen suggested that Plaintiff had psychological or behavioral abnormalities and demonstrated loss of specific cognitive abilities. *See* Tr. at 191–93, 209–10, 240–43. However, no medical source suggested Plaintiff had an intellectual disability. *See id.* The ALJ based his conclusion on Dr. Allen's assessment, noting that Dr. Allen "states that it is beyond the scope of his evaluation to state this conclusively, but he saw the claimant as an individual who [could] well be experiencing difficulties of an organic nature." Tr. at 18 *citing* Tr. at 243. As discussed above, organic mental disorders and intellectual disabilities are distinguished based on the origin and manifestation of symptoms. Because one could imagine a scenario in which an individual with an intellectual disability sustained damage to his brain later in life that further reduced his functional abilities, the two are not mutually exclusive. However, the undersigned finds that the record in this case lends support to the ALJ's conclusion that Plaintiff had an organic mental disorder, but not an intellectual disability.

In *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir., 1985), the court held that, in the absence of any evidence of a change in a claimant's cognitive functioning, IQ scores derived after the developmental period could be used to support a finding of intellectual disability under Listing 12.05. However, the record provides two organic sources to explain changes in Plaintiff's cognitive functioning after the developmental period. First, Plaintiff informed Dr. Kelly that his memory problems began after the rollover accident in 2005. *See* Tr. at 192. Although emergency room records following the accident contain no objective evidence to suggest Plaintiff sustained a traumatic brain injury, the undersigned has considered Plaintiff's indication that his memory problems

27

began after that accident. *See id. But see* Tr. at 401–07. The undersigned concludes that Plaintiff's history of head trauma is an organic source that could have reasonably led to a decrease in his cognitive functioning. *See DSM-V* at 625. The undersigned also considers Plaintiff's documented history of alcohol abuse to be another organic source that could have reasonably led to a decrease of his previously-acquired functional abilities. *See* Tr. at 397 (reported he drank a 12-pack and a pint of gin daily on December 28, 2006), 392 (acute alcohol intoxication on April 20, 2007), 387 (positive alcohol on April 25, 2007), 378 (alcohol intoxication on May 6, 2007), 331 (admitted to drinking an 24-pack of beer daily on January 23, 2009), 301 (smelled strongly of alcohol on October 1, 2009), 288 (intoxicated on January 31, 2010), 279 (admitted to heavy alcohol use on June 3, 2011), 272 (blood alcohol content 299.6 mg/dL on December 23, 2011), 252 (smelled of alcohol on February 14, 2012). Persistent substance abuse may result in "neurocognitive impairments that persist beyond the usual duration of intoxication and acute withdrawal" and may result in "decrements in a range of cognitive abilities." *See DSM-V* at 629. Alcohol abuse is particularly associated with "a combination of impairments in executive-function and memory and learning domains." *DSM-V* at 630. In light of evidence of plausible organic sources for a decrease in Plaintiff's cognitive functioning, the undersigned concludes that substantial evidence supports the ALJ's finding that Plaintiff had an organic mental impairment. The undersigned further finds that the ALJ was not required to accept the IQ scores derived by Dr. Allen as reflective of Plaintiff's IQ during the developmental period in the presence of organic factors that reasonably explained the decrease in Plaintiff's previously-acquired functional abilities.

The undersigned finds that the record does not support a finding that Plaintiff had an intellectual disability because it lacks objective proof to support a manifestation of subaverage intellectual functioning prior to age 22. *See* Tr. at 20, 172–78. In *Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012), the court determined that substantial evidence supported the ALJ's conclusion that the plaintiff did not have subaverage intellectual functioning during the developmental period. In *Hancock*, the ALJ considered a decline in the plaintiff's grades from the fifth to eighth grades and evidence of low IQ scores, but determined the decline in the plaintiff's grades could be explained by frequent absences and that the plaintiff's IQ scores were higher than would be expected from an individual with an intellectual disability. *Id.* In the instant case, the ALJ discussed Plaintiff's school records, the correspondence from his mother, and his indications to Dr. Kelly. *See* Tr. at 20. Despite Plaintiff's mother's indication to the contrary, the ALJ noted that both the school records and Plaintiff's statement to Dr. Kelly suggested he was not enrolled in special education. *Id.* The ALJ acknowledged that Plaintiff failed the third grade, had a low grade point average, performed below grade-level, and was illiterate, but he concluded that the record did not objectively prove that Plaintiff had subaverage intellectual functioning. Tr. at 20–21. The ALJ also discussed the improvement in Plaintiff's grades when he repeated the third grade. Tr. at 20. Plaintiff concededly performed poorly in school, but poor school performance may result from many factors and intellectual disability is merely one of them. The record suggests at least two organic factors that likely affected Plaintiff's IQ. In light of the Fourth Circuit's holdings in *Branham* and *Hancock*, the undersigned concludes that the ALJ's determination that

Plaintiff did not prove the existence of subaverage intellectual functioning during the developmental period was supported by substantial evidence.

In the absence of subaverage intellectual function with deficits in adaptive functioning during the developmental period, it was impossible for Plaintiff to meet parts (B) or (C) of Listing 12.05. However, the ALJ went a step further, finding that Plaintiff failed to meet the additional diagnostic criteria under the Listing. The ALJ addressed the full-scale IQ score of 55 obtained by Dr. Allen, but concluded that the score of 55 was inaccurate because of Plaintiff's slow responses. *See* Tr. at 20. In *Hancock*, the court held that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." 667 F.3d at 475. Because the ALJ provided a reasonable explanation for discounting the full-scale IQ of 55 and because even the examiner discounted Plaintiff's IQ score, the ALJ did not err in determining that Plaintiff failed to meet part (B) of Listing 12.05. *See* Tr. at 20, 241. Although the ALJ accepted Dr. Allen's opinion that Plaintiff's actual IQ was likely in the mid-sixties, he found that Plaintiff could not meet the second prong of Listing 12.05(C) because he had no physical or other mental impairment imposing an additional and significant work-related limitation of function. *See* Tr. at 20–21. The record did not support the existence of additional severe impairments. Therefore, the ALJ's conclusion was supported by substantial evidence.

In the absence of significant evidence to support onset of subaverage intellectual functioning during the developmental period and based on Plaintiff's failure to meet any

of the additional criteria under parts (B) or (C) of Listing 12.05, the ALJ did not err in concluding Plaintiff did not have an impairment that met the severity of the Listing.

3.    RFC Assessment

Plaintiff argues the ALJ failed to consider the effects of all of his impairments on his RFC. [ECF No. 14 at 14]. Plaintiff contends the ALJ neglected to consider as part of his RFC finding Dr. Allen's indication that Plaintiff's slow response time could pose a danger to himself or others in the workplace. *Id.* He also maintains the ALJ neglected to consider that Plaintiff would have difficulty interacting with supervisors based on his inability to understand their requests. *Id.*

The Commissioner argues the ALJ considered and discussed all of the limitations imposed by Plaintiff's conditions in accordance with SSR 96-8p. [ECF No. 16 at 18]. She maintains that the ALJ adequately accounted for Plaintiff's established mental limitations by restricting him to simple, routine jobs that did not require literacy, permitted oral instruction, did not involve cash transactions, did not require work with the public, and allowed Plaintiff to work alone or with a small group of co-workers. *Id.* at 19. She further asserts that the record did not support the presence of any physical restrictions. *Id.* at 20.

RFC is an assessment of the claimant's ability to perform sustained work-related activities eight hours per day, five days per week. SSR 96-8p. RFC considers only those medically-determinable limitations that result from the claimant's physical impairments, mental impairments, or combination of impairments. *Id.* The ALJ must identify the limitations imposed by the claimant's impairments and assess his work-related abilities on a function-by-function basis. *Id.* "The RFC assessment must include a narrative

discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.*

The RFC assessment must be based on all of the relevant evidence in the case record, which includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations. *Id.* If a medical source has rendered an opinion, the ALJ must address the medical source's opinion as part of the RFC assessment and if the ALJ declines to adopt the opinion, he must explain his reasons for deviating from the opinion. *Id.*

The ALJ found that Plaintiff would have difficulty functioning with the public or in team-type interactions because of educational deficits. Tr. at 14. He found that Plaintiff would require simple, routine jobs where oral instructions could be given if needed because of educational deficits and functional illiteracy. *Id.* He concluded that Plaintiff had no physical limitations. Tr. at 21. The ALJ stated that because Plaintiff had no more than a high marginal education and was illiterate, he was limited to routine, simple work, with oral instructions at the job site, no cash transactions, no work with the public as customers, no team-type interactions and working alone. *Id.*

The undersigned finds that the ALJ failed to properly assess Plaintiff's RFC. The ALJ explained that he based the restrictions on Plaintiff's educational deficits and

illiteracy. Pursuant to SSR 96-8p, the RFC should consider the restrictions that result from the claimant's impairments, but the ALJ failed to impose any specific restrictions based on the organic mental impairment that he determined to be Plaintiff's only severe impairment. He only specified that he considered Plaintiff's high marginal education and illiteracy in assessing Plaintiff's RFC. *See* Tr. at 14, 21. Based on this error, the undersigned cannot find that the ALJ considered the combined effects of Plaintiff's impairments or even the effects of the one impairment he found to be severe.

In addition, the ALJ discussed and appeared to accept Dr. Allen's assessment of Plaintiff's IQ in the mid-sixties and his impression that Plaintiff had an organic mental impairment, but he neglected to indicate how he weighed other aspects of Dr. Allen's opinion. *Compare* Tr. at 13 (finding organic mental disorder to be a severe impairment), 18 (recognizing Dr. Allen's assessment of an organic mental impairment), and 20 (acknowledging Plaintiff's IQ to be in the mid-sixties), *with* Tr. at 242–43 (noting evidence of Plaintiff's distractibility, low-energy, and lack of engagement with his surroundings and stating that his slow, deliberate style could place himself and others at risk in the work setting). Although the ALJ assessed an RFC that provided for oral instructions based on Plaintiff's illiteracy, he neglected to consider what Dr. Allen indicated were deficits in Plaintiff's ability remember oral instructions. *See* Tr. at 242. The ALJ also failed to account for any limitations imposed by Plaintiff's "slow, deliberate style" that Dr. Allen indicated could put himself and others at risk. *See* Tr. at 243. He did not specify that Plaintiff should avoid exposure to hazards or restrict Plaintiff to work that did not require a fast pace. Based on the directives of SSR 96-8p, the ALJ

had to either accept Dr. Allen's opinion and the restrictions it imposed or explain why he did not adopt Dr. Allen's restrictions. Because he failed to do either, the undersigned is unable to find that he complied with the provisions of SSR 96-8p.

### 4. Credibility

Plaintiff argues the ALJ's recitation of the medical evidence and the claimant's testimony was not an actual credibility finding. [ECF No. 14 at 15]. Plaintiff maintains the ALJ did not follow the requirements of SSR 96-7p and failed to provide specific rationale for rejecting Plaintiff's testimony. *Id.* at 16.

The Commissioner argues the ALJ properly analyzed Plaintiff's subjective complaints, discussed the evidence, and explained his credibility finding. [ECF No. 16 at 21].

Allegations of pain or other symptoms in the absence of medical signs and laboratory findings demonstrating the existence of a medically-determinable impairment cannot be the basis for a disability finding. SSR 96-7p. The ALJ should only consider the intensity, persistence, and functionally-limiting effects of symptoms after the claimant has established the existence of a medically-determinable impairment. *Id.* "[T]he adjudicator must carefully consider the individual's statement about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. *Id.* To assess the credibility of the claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the

symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard the claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.* Furthermore, the ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* The ALJ's decision must clearly indicate the weight accorded to the claimant's statements and the reasons for that weight. *Id.*

The ALJ found "that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms" lacked credibility insomuch as they were inconsistent with the assessed RFC. Tr. at 19. The ALJ explained that Plaintiff's alleged problems with his back, right arm, right elbow, and cervical spine were not supported by the objective evidence of record. *Id.* He also concluded that the record did not support limitations in addition to those resulting from Plaintiff's illiteracy and high marginal education. Tr. at 21.

The undersigned finds that the ALJ's credibility finding with respect to Plaintiff's alleged physical impairments was supported by the record. As discussed above, the record did not contain medical signs and laboratory findings that supported the existence of any physical impairment. Therefore, the ALJ was not required to consider Plaintiff's complaints of pain in assessing his RFC.

However, the undersigned finds that the ALJ neglected to adequately assess Plaintiff's credibility with respect to the alleged limitations resulting from his mental impairment. The ALJ must consider the entire record in assessing Plaintiff's credibility,

but he failed to consider the limitations set forth by Dr. Allen. Furthermore, while the ALJ thoroughly discussed the evidence with respect to Listing 12.05 and recited some of the limitations Plaintiff set forth in his testimony, he did not specify the weight given to Plaintiff's statements or the reasons for that weight. Therefore, the undersigned finds that the ALJ did not comply with the requirements of SSR 96-7p.

5.    Improper VE Hypothetical

Plaintiff argues the vocational testimony was flawed because the ALJ failed to include all of his impairments in the hypothetical questions posed to the VE. [ECF No. 14 at 16].

At step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). The purpose of bringing in a VE is to assist the ALJ in determining if the Commission has met this burden. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). For a VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record" and "must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.*; *see also Johnson*, 434 F.3d at 659; *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

36

The ALJ concluded "[b]ased on the testimony of the vocational expert," that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. at 22.

Because the undersigned has not found that additional restrictions were supported by the record, but only that the allegations of additional restrictions were not addressed, the undersigned declines to address the appropriateness of the ALJ's hypothetical questions and the VE's responses. The ALJ should address the additional alleged restrictions on remand. If he determines that the record supports the existence of additional restrictions, the ALJ should obtain VE testimony to determine the implications of the additional restrictions on Plaintiff's ability to engage in work activity.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

February 4, 2015                                Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

37